Filed 1/28/26; Certified for Publication 2/11/26 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B339253 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA060767) |
| v. | |
| MONICA DIAZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maria Andrea Davalos, Judge.  Affirmed.

Juvenile Innocence and Fair Sentencing Clinic, Christopher Hawthorne, Alice Newman, and Michael Capovilla for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Several times during 1999, 16-year-old Monica Diaz and her boyfriend confided in one another about their admiration for murderers and their desire to commit murder themselves. In the early morning hours of July 21, 2000, they followed through. Diaz let her boyfriend into her home and waited in the bathroom while he stabbed her uncle, aunt, and three cousins; everyone except the aunt perished from their wounds. Diaz's fingerprints or palm print were found on butterfly and throwing knives at the murder scene and on a roll of duct tape that was to be used to bind the victims or cover their mouths. A jury, instructed as to both direct aiding and abetting and felony murder theories, convicted Diaz of four counts of first degree murder among other charges. The trial court sentenced Diaz to four consecutive terms of 25 years to life.

In 2020, Diaz sought resentencing pursuant to Penal Code section 1172.6.[1] After an evidentiary hearing, the court found Diaz guilty of first degree murder under current law under two theories: (1) directly aiding and abetting the murder with the intent to kill (i.e., she harbored express malice); and (2) as a major participant in the underlying felony (burglary with false imprisonment) who acted with reckless indifference to human life. Diaz does not dispute any facts regarding her involvement in the murders, but argues the trial court erred in failing to consider her youth when determining whether she possessed the requisite mental state under either theory. She further argues

_____

[1] Further unspecified statutory references are to the Penal Code. The statute was initially enacted at section 1170.95, and later renumbered as section 1172.6, effective June 30, 2022 (Stats. 2022, ch. 58, § 10). For ease of reference, we use the current citation at section 1172.6 throughout this opinion.

that her counsel rendered ineffective assistance by not sufficiently focusing the court's attention on her youth.

Diaz has not demonstrated that the trial court erred in determining that she acted with express malice. Because resentencing under section 1172.6 is not available to a direct aider and abettor of murder who acts with intent to kill, this is dispositive of her appeal, and we do not consider her argument that the court failed to consider her age when finding she acted with reckless indifference to human life. We thus affirm.

## BACKGROUND

### A. Factual Summary

Diaz requests that we take judicial notice of our opinion in her direct appeal (*People v. Diaz* (Dec. 22, 2005, B175089) [nonpub. opn.] (*Diaz I*)), explaining she does not dispute that she "participated [in the offense conduct] in the ways described in [*Diaz I*]." The Attorney General also relies on *Diaz I* for its factual summary. Accordingly, we take judicial notice of *Diaz I* and rely on its factual recitation, as background only. We draw the facts upon which we rely for our substantial evidence analysis from the trial testimony considered by the court as part of the section 1172.6, subdivision (d)(3) evidentiary hearing.

In July 2000, 16-year-old Diaz and her 17-year-old half-sister, Laura R., lived with Diaz's aunt and uncle, Richard and Sylvia F., and their four children, 18-year-old Esperanza, 17-year-old Richard Jr., 14-year-old Sylvia Jr., and 10-year-old Matthew. Diaz and Laura's mother had died when Diaz was three years old. After a period of living with other relatives, Diaz and Laura came to live with Richard and Sylvia. Diaz and Laura were considered part of the family. (*Diaz I*, *supra*, B175089.)

3

Diaz met Michael Naranjo in high school.  By March or April 1999, they were girlfriend and boyfriend, and Naranjo was a frequent guest at Richard and Sylvia's house.  In a letter to Naranjo dated March 9, 1999, Diaz talked admiringly about murderers.  She stated that "[t]he best job is to kill people professionally" and that books about serial killers were her favorites because she could learn from their mistakes.  In an April 1999 letter, Diaz told Naranjo that she thought the Columbine school shootings "kicked ass" and that the "Trenchcoat Mafia" who committed that massacre was "cool."  In another letter written in April, Diaz told Naranjo that when there was a minimum school day, the two "should do something that day.  Not your average day though.  Go, kill a few people.  Break some windows and stuff like that.  You get the picture, right?  Maybe I should add some more details to it.  I just have to do something really crazy and really soon.  Cause if I don't, I might hurt the people I care about most."

In the early morning hours of July 21, 2000, the members of Diaz's household (except for Diaz) were asleep in bed.  Sylvia awoke to find an intruder struggling with her husband.  She realized that she was bleeding and kicked the intruder, who fell and then fled.  Esperanza was awakened by the noise, got up to investigate, and saw someone go out the back door.  She went into her parents' bedroom, where her father told her that he had been stabbed before falling to the floor.  Esperanza attempted to dial 911 but the home phone did not work.  She ran across the street and called 911 from a neighbor's home.

Sheriff's deputies and paramedics who arrived at the scene found Richard on the bedroom floor, dead from multiple stab wounds.  Sylvia also had multiple stab wounds, for which she was

4

taken to the hospital; she survived.  Richard Jr. and Matthew were found dead in the bedroom that they shared.  Sylvia Jr. was found dead in the bedroom she shared with Diaz.  Like Richard, all had died of multiple stab wounds.  Esperanza and Laura, who also shared a bedroom, were not harmed.

Witnesses at the scene testified that Diaz appeared calm and seemed unaffected in the aftermath of the murders.  She kept to herself, playing with a toy bear while others mourned.  Investigators found a butterfly knife and a throwing knife in one of the bathrooms of the house.  A flashlight with a red lens was found in the hallway.  Near the gate to the side yard, other knives, an axe, and a roll of duct tape were found.  Pieces of duct tape were also found at three locations inside the house and on the air conditioning unit outside.

Diaz spoke with officers the next afternoon.  She said she was in the bathroom during the attack.  When shown photographs of the butterfly and throwing knives, Diaz said they were not in the bathroom when she was there.

In the days following the murders, Diaz stayed with a relative.  Naranjo often came to visit, and he and Diaz were affectionate with each other, mainly staying by themselves.  At one point Diaz visited Sylvia in the hospital but "seemed distant."

Forensic examination revealed Diaz's fingerprints or palm prints on the knives found in the bathroom, the piece of duct tape on the air conditioning unit, and the roll of duct tape.  All of the pieces of duct tape found by officers had been part of the same roll.  Naranjo's prints were on one of the knives found in the bathroom and the flashlight.

Diaz and Naranjo were arrested on July 26, 2000.  While they sat in a police car, they professed their love for each other.

Sometime later, Esperanza visited Diaz in jail. Diaz told Esperanza that no one was supposed to die and that the plan was to tie up the family members and put duct tape over their mouths. The purpose of this scheme was to bring the family together.

## B.     The Charging Document

An amended information charged Diaz and Naranjo with four counts of murder (§ 187, subd. (a); counts 1-4) and one count of attempted murder (§§ 187, subd. (a), 664; count 5). It further alleged the multiple murder special circumstance within the meaning of section 190.2, subdivision (a)(3). Naranjo pleaded guilty to all charges against him.

## C.     The Defense's Trial Evidence

Diaz's defense included that she was young and susceptible to Naranjo's influence. During opening statement, defense counsel told the jury, "[Y]ou must consider this case in the context of a young woman or young girl that was 16 years old at the time," and called Naranjo a "Svengali," who "convince[d]" Diaz that a staged robbery would bring her family together while he "used . . . Diaz as his ticket inside" the home to kill her family.

### 1.     *Naranjo*

Naranjo testified that Diaz told him Richard and Sylvia had been having problems with each other. In response, Naranjo devised a plan in which he would break into the family home and pretend to commit a robbery. But, explained Naranjo, unknown to Diaz, he actually planned to kill all the family members once he got inside. Naranjo had no particular reason for wanting to do this, although he had been thinking about killing people from the time he was 13 or 14 years old. (In March or April 1999, Naranjo

6

wrote a letter to Diaz in which he said that the one thing he wanted to "do before [his] life ends, one thing is to kill a shit-load of people.") While he was attacking Richard and Sylvia in their bedroom, Sylvia kicked him. Naranjo then went into the bathroom, where Diaz was waiting, and handed some knives to her. She put them down and left the bathroom. Naranjo then fled.

Naranjo also testified that his mother saw him get into bed that evening. He and Diaz planned for him to come to Diaz's home around 1:30 a.m., and he waited at the back door for Diaz to let him in. After the murders, Naranjo returned to his house and went to bed. Diaz telephoned him, causing it to seem to his mother that Naranjo had been in bed all night. After the telephone call, Naranjo went to Diaz's home and gave law enforcement a toy bear for Diaz. Witnesses observed her playing with the bear at the scene.

2.   *Diaz*

Testifying in her own behalf, Diaz asserted that she had written letters to Naranjo about murder because she knew he was interested in the subject and she wanted to get him to like her. She thought Naranjo's interest in killing people was "just talk." She knew that Naranjo had a collection of knives but did not think much of it.

According to Diaz, at one point Richard and Sylvia started to argue with each other. She thought their marriage was at risk and felt anxious about what would happen to her if they separated. Hearing this, Naranjo proposed a plan by which he would come to the house, bind the family members, gather property and pile it in the living room as if it were going to be stolen, and then leave without taking anything. Naranjo said

7

that doing so would scare the family and make them unite. Diaz initially thought the plan was unworkable but reconsidered when Naranjo explained that the lights would be off so he would not be identified.

Diaz said that, on the night of the murders, she went outside when Naranjo arrived and helped him cut the duct tape. She did not see any weapons at that time. The two then entered the house and Diaz went into the bathroom. She heard struggling noises from other rooms, and when Naranjo came into the bathroom, he had two knives and was covered in blood. At that point, Diaz realized that her family members had probably been hurt. She went to see what was happening as Naranjo fled. She did not want to believe what she saw and did not tell the police because she was in denial. She told the police about Naranjo only after she and Naranjo had been arrested. When police asked Diaz what Naranjo planned to bring to scare her family, Diaz said she assumed he would have knives with him as he always carried them. She also told police that she called Naranjo at his home to give him an alibi.

Diaz testified that Naranjo was well-acquainted with her family, but he did not attempt to conceal his identity with a mask during his attack. When asked to explain how Naranjo planned to bind Diaz's family without being recognized, she responded she did not think about it.

Diaz's testimony included several references to her youth. For example, Diaz testified that her mother died when she was three years old, and until third grade, she sometimes lived with her grandmother, who was abusive. Diaz met Naranjo when she was 14 years old, and they started dating when she was 15 years old.

### 3.    *Dr. Gregory Doane*

Child psychiatrist Dr. Gregory Doane testified that for about one and one-half years he had been meeting with Diaz in the juvenile facility where she had been detained following the murders.  Dr. Doane's initial diagnosis of Diaz was dysthymic disorder, a condition of low to mid-grade depression which persists throughout one's life.  Two weeks later, Dr. Doane revised the diagnosis to include major depression with psychotic features.  In September 2000, Dr. Doane again revised the diagnosis, this time to include borderline personality disorder.

Dr. Doane opined that at approximately three years of age, Diaz "apparently must have gone through a lot of abandonment, . . . feelings of no stability, and throughout the rest of her teenage years kind of emotionally relived those chaotic years, and being very afraid of being abandoned."  Diaz reported that between ages four and six, she invented an imaginary character, a person named "Freddy."  The character had "stayed with her" and "took on a psychotic hallucinatory value when she was under stress."  Dr. Doane explained that "[w]hen stressed [Diaz] tends to disassociate . . . .  She just can't realize what's gone on."  Diaz's failure to report that Naranjo had committed the murders and that Diaz continued to cling to him after the murders was consistent with her diagnoses.  "She idolized [Naranjo], she couldn't see any wrong in him, and she just couldn't put two and two together when she saw what happened."  "[U]ntil the very end she considered [Naranjo] to be God, basically."  It was "credible to [Dr. Doane] that [Diaz] just basically could not understand what had happened and just refused to think about it."  However, Dr. Doane also testified that a person with borderline personality disorder could feel an intense and

9

irrational hatred of people and that the shift from love to hate could occur rapidly.

**D.    Closing Argument**

The prosecutor argued to the jury that Diaz and Naranjo had jointly planned the murders and Diaz was therefore guilty of premeditated murder and murder by lying in wait, as well as attempted premeditated murder of Sylvia.  The prosecutor further argued that Diaz's testimony constituted a judicial admission of first degree felony murder under the theory that Diaz had aided and abetted a burglary in which she intended that her family be falsely imprisoned to frighten them.  (*Diaz I*, *supra*, B175089.)

In Diaz's argument to the jury, her counsel referred to Dr. Doane's testimony about Diaz's efforts to avoid abandonment and her idolization of Naranjo.  Counsel described Diaz's vulnerability, calling her "a 16-year-old star-struck child," who "was duped" by Naranjo, and argued Naranjo was solely responsible for the murders.  Counsel acknowledged the existence of the felony-murder theory but did not directly refute it.  (*Diaz I*, *supra*, B175089.)

**E.    The Verdict, Sentence, and Appeals**

The jury was instructed on premeditated, deliberate murder and felony-murder theories.  It found Diaz guilty of all counts and found the multiple-murder special-circumstance allegations true.  The court sentenced Diaz to life without the possibility of parole for counts 1 through 4 and 15 years to life for count 5 for attempted murder.

On direct appeal, we reversed Diaz's attempted murder conviction (count 5) and the special circumstance findings.  We explained, "[Diaz] contends that, by way of evidentiary rulings

10

[excluding Dr. Doane's testimony that a vulnerable and dependent person could be dominated by someone else] and a special instruction [that being under the influence of another person was not a defense to homicide], the trial court erroneously limited consideration of evidence that [Diaz] thought her boyfriend would only frighten the people inside the house by pretending to rob them and did not know of his plan to kill. We find merit in this contention to the extent that attempted murder and multiple[-]murder special circumstances require proof of intent to kill. But the error did not affect [Diaz]'s guilt of first degree felony murder on the prosecution's alternative theory that [Diaz] aided and abetted a burglary by entering the house with the intent to commit felony false imprisonment." (*Diaz I*, *supra*, B175089.)

The People elected not to retry the attempted murder and special circumstances allegations. (*People v. Diaz* (May 23, 2008, B198569) [nonpub. opn.] (*Diaz II*).) The trial court denied Diaz's request to continue her sentencing hearing and resentenced Diaz to consecutive terms of 25 years to life for each of the four murder counts. Diaz appealed. We held the court erred in denying the requested continuance and remanded for a new sentencing hearing. (*Ibid*.)

During that resentencing, Diaz argued her age and immaturity, among other things, were mitigating factors. (*People v. Diaz* (Apr. 28, 2011, B218806) [nonpub. opn.] (*Diaz III*).) The trial court sentenced Diaz to four consecutive terms of 25 years to life. (*Ibid*.) Diaz appealed and we affirmed (with modification of custody credits), explaining that in *Diaz I* "[w]e did not conclude that the record established that [Diaz] was *only* an aider and abettor in a felony murder, as [Diaz] argues repeatedly in this

11

appeal, but merely that no retrial of the murder charges was required because she was *at least* an aider and abettor in a felony murder. . . . [T]he trial court was not required to minimize the role [Diaz] played in the crimes or accept either the psychological evidence or [Diaz]'s and Naranjo's testimony that she did not intend for anyone to be killed." (*Diaz III*, *supra*, B218806.)

## F. Diaz's Resentencing Petition

In 2020, Diaz filed a petition for resentencing pursuant to section 1172.6. In 2022, the superior court found Diaz had made a prima facie showing and issued an order to show cause.

At the May 24, 2024 evidentiary hearing, the court took judicial notice of the clerk's transcripts and reporter's transcripts from trial and indicated that it had reviewed them. The People argued that the evidence demonstrated that Diaz and Naranjo planned and orchestrated the slaughter of Diaz's family members. During argument, the People observed that Diaz was 16 years old at the time of the murders.

Diaz attended the hearing by Webex. She did not testify or offer any evidence (including but not limited to any evidence excluded from her trial). Diaz's counsel argued that she lacked the intent to kill. Diaz and Naranjo planned to stage a burglary with the hope it would bring the family together, but Naranjo strayed from the plan when he killed Diaz's family members. Diaz's counsel further explained, "[S]he was 16 [years old] at the time. . . . The fact that they concocted this plan . . . doesn't mean that that was thought through in a manner that would create such liability for . . . Diaz. The issue is whether or not she knew at the time that . . . Naranjo was going to kill members of her family. He's clear that she didn't, and she also is adamant in her testimony that she never held such an intent." Diaz conceded she

12

was a major participant in the crime but argued the evidence did not establish that she acted with reckless indifference to human life.

The trial court did not find the defense's version of events credible, stating "[I]t was clear to this court that . . . Diaz and . . . Naranjo were continuously concocting plans.  They concocted this plan to kill the members of this family that took her in."  The court observed that both Diaz and Naranjo "had been fantasizing about" the murders for "months before the actual killings."  The court described that Diaz's conduct "belies her contentions that she did not know that . . . Naranjo was going to kill her family members."  It pointed to the letters Diaz had written to Naranjo and her conduct after the killings, including that Diaz never expressed surprise about the killings and continued her relationship with Naranjo.  The court concluded Diaz was a direct aider and abettor in the killings who acted with the intent to kill. The court also determined Diaz was a major participant in the underlying burglary who acted with reckless indifference to human life.  The court denied Diaz's resentencing petition.

## DISCUSSION

### A.    General Legal Principles Regarding Section 1172.6 and Standard of Review

Effective 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) narrowed the scope of the felony-murder rule.  (*People v. Curiel* (2023) 15 Cal.5th 433, 448, citing § 189, subd. (e).)  Under current law, "A participant in the perpetration or attempted perpetration of a [specified] felony . . . in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, . . . or assisted

13

the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).)

Senate Bill No. 1437 also required that except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Thus, Senate Bill No. 1437 eliminated murder liability under the natural and probable consequences doctrine. (*People v. Reyes* (2023) 14 Cal.5th 981, 984.)

Senate Bill No. 1437 did not change the law as to an accomplice's liability for directly aiding and abetting a murder with malice aforethought. (*People v. Gentile* (2020) 10 Cal.5th 830, 848; see *People v. Offley* (2020) 48 Cal.App.5th 588, 595-596 [explaining direct aiders and abettors of murder "necessarily 'know and share the murderous intent of the actual perpetrator' "].) Malice may be express or implied. (§ 188, subd. (a).) "Malice is express when a defendant intends to kill . . . ." (*In re Ferrell* (2023) 14 Cal.5th 593, 600) " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citations.] ' "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in

14

achieving those unlawful ends.' " ' " (*People v. Ramos* (2024) 103 Cal.App.5th 460, 465-466.)

The trial court denied Diaz's petition at a section 1172.6, subdivision (d)(3) evidentiary hearing. During that stage, "the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after [Senate Bill No. 1437]." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.) "The admission of evidence in the [evidentiary] hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)

Ordinarily, we review the trial court's factual findings following a section 1172.6, subdivision (d)(3) evidentiary hearing for substantial evidence. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.) Diaz argues our review should be de novo because she "does not ask this [c]ourt to examine the trial court's evidentiary findings. The facts are undisputed." She contends her "right to have her youth considered presents a 'pure question of law.' " (Underscoring omitted.) We do examine legal questions de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) However, there are facts here—such as whether Diaz had the intent to kill—that are disputed, and as to which Diaz argues the court should have interpreted the evidence differently. Thus, to the extent Diaz challenges the court's factual findings (which include the inferences the court drew from uncontested facts), we review the record for substantial evidence, contradicted or uncontradicted, to support the court's finding. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480.) We examine the record in the light most

15

favorable to the judgment and defer to the trial court's implicit credibility findings. (*Id*. at pp. 480, 482.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [fact finder]'s verdict.' " (*People v. Davis* (2024) 107 Cal.App.5th 500, 510.)

## B. Youthful Offenders in Section 1172.6 Proceedings

Diaz does not contest that the evidence established the actus reus element that she directly aided and abetted the murders or that she was a major participant in the underlying felony. Rather, Diaz contends that the court should have considered her youth in determining whether she had the requisite mental state of reckless indifference to human life or intent to kill (i.e., express malice). We thus limit our discussion to these mental states.

" '[R]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death." ' " (*People v. Emanuel* (2025) 17 Cal.5th 867, 883.) Recklessness includes a subjective element that " ' "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' " (*Id*. at p. 884.) *People v. Clark* (2016) 63 Cal.4th 522, 617 set out a nonexhaustive list of factors for courts to consider when determining whether reckless indifference existed. (*In re Scoggins* (2020) 9 Cal.5th 667, 677; see also *People v. Emanuel*, *supra*, at p. 884.) However, "[t]he 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference." (*People v. Emanuel*, *supra*, at p. 885.)

16

Since 2021, "Courts of Appeal have recognized that 'a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.' " (*People v. Emanuel, supra*, 17 Cal.5th at p. 885, fn. 6; see, e.g., *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1002; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093; *People v. Keel* (2022) 84 Cal.App.5th 546, 558-559; *In re Harper* (2022) 76 Cal.App.5th 450, 470; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991; *In re Moore* (2021) 68 Cal.App.5th 434, 454.)[2] This is because the " 'hallmark features' of youth," including " 'immaturity, impetuosity, and failure to appreciate risks and consequences,' " bear upon a youthful offender's culpability. (*In re Moore, supra*, at p. 454.) Case law "stress[es] two areas of divergence" between youthful offenders and adults: (1) youthful offenders' "relative impulsivity"; and (2) "their vulnerability to peer pressure." (*People v. Oliver, supra*, 90 Cal.App.5th at p. 489; see *People v. Jones, supra*, at p. 1093.)

*People v. Pittman* (2023) 96 Cal.App.5th 400 extended the consideration of a defendant's youth to implied malice murder cases. *Pittman* explained, "The policy interests underlying the felony-murder cases—that youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability—apply equally in the context

---

[2] Although a relevant factor, youth is not dispositive and courts have recognized that youthful offenders can act with reckless indifference to human life. (*Tison v. Arizona* (1987) 481 U.S. 137, 151-152, 158 [107 S.Ct. 1676, 95 L.Ed.2d 127] [19-year-old and 20-year-old acted with reckless indifference to human life]; *In re Harper, supra*, 76 Cal.App.5th at p. 453 [16-year-old acted with reckless indifference to human life].)

of implied malice murder. . . . [T]he implied malice mental state—conscious disregard for human life [citation]—is similar to the 'reckless indifference to human life' standard applicable to felony murder. [Citation.] Indeed, the concept of reckless indifference to human life has a subjective component that expressly incorporates the 'conscious[] disregard' of ' "the significant risk of death [the defendant's] actions create." ' [Citation.] Given these similarities, and the lack of any distinction supplied by the parties, we see no reason not to apply the principle articulated in the felony-murder cases here." (*Id.* at p. 417.)

## C.    Analysis

Based upon these legal developments—all of which occurred before the evidentiary hearing here, and of which the trial court was thus presumably aware[3]—Diaz argues the trial court erred in not considering her youth. She further argues that had the court not so erred, there was a reasonable probability that the result would have been more favorable to her. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The trial court found Diaz ineligible for resentencing relief for two independent reasons, one of which was that she was a direct aider and abettor who acted with express malice. (*People v. Ramos*, *supra*, 103 Cal.App.5th at p. 465 [direct aider and abettor who had the intent to kill is ineligible for § 1172.6 relief].)

_____

[3] A reviewing court "presume[s] . . . that the [trial] court knows and applies the correct statutory and case law." (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The court was aware of Diaz's age at the time of the offense; the trial record was rife with references to her youth, and her counsel at the section 1172.6 evidentiary hearing argued that her age meant there was not a "thought through" plan to murder anyone. The court rejected that claim, found the "bring[ing] the family together" excuse not credible, and found Diaz intended to kill her family members and helped Naranjo accomplish that goal. In doing so, the court admittedly did not expressly reference Diaz's age. But Diaz cites no case—and we are aware of none—suggesting that a court hearing a section 1172.6 petition must expressly state that it has considered the defendant's youth in evaluating whether he or she had the express intent to kill.

Because a defendant who acts with express malice intends that his or her conduct result in death, express malice does not implicate to the same degree the concerns that arise when evaluating whether a youthful defendant's perception of risks supports a finding of reckless indifference or implied malice. Diaz argues that *In re Moore, supra*, 68 Cal.App.5th at page 454 states, "[a]ge and youth-related factors are always relevant to determining intent to kill." This quote does not appear on page 454 of that opinion nor anywhere else in it. Diaz also cites *People v. Ramirez, supra*, 71 Cal.App.5th at page 991 and *People v. Jimenez, supra*, 103 Cal.App.5th at page 1007 for the proposition that, as she puts it, "youth fundamentally limit's one's ability to form the same level of criminal *intent* as an adult." (Italics added.) Each of the cases she cites, however, concerned whether the defendant acted with reckless indifference to human life, a different mental state than intent to kill/express malice. "Cases are not authority for propositions they do not consider." (*People v. Martinez* (2000) 22 Cal.4th 106, 118.)

19

Diaz also argues that like the defendant in *People v. Jimenez, supra*, 103 Cal.App.5th 994, her youth made her "particularly susceptible to" Naranjo's influence. She explains that she "was subject to a substantial amount of peer pressure related to the offense. . . . [She] had recently begun a new romantic relationship with Naranjo, who ultimately planned and committed the killings. Naranjo had a preexisting interest in committing violent crimes before he ever became romantically involved with [Diaz]."

As to the court's finding of express malice, this argument fails for at least two reasons. First, *Jimenez* is distinguishable. It is a reckless indifference case and not an express malice case. Even setting that aside, the defendant there "had only known [his girlfriend] for less than a month before the offense, and there is no evidence he knew or had reason to know she had a propensity for violence." (*People v. Jimenez, supra*, 103 Cal.App.5th at p. 1008.) Here, Diaz and Naranjo's relationship was not short-term or "new," and the letters between the two support the conclusion that Diaz was well aware of Naranjo's propensity for violence and desire to murder, shared it, and wanted to participate in such a crime along with him.

Second, Diaz's "peer pressure" argument ignores that the court's finding that she had the intent to kill means the court necessarily found she personally *wanted* her family members dead and not that she was under the influence of someone else who wanted to kill them. Indeed, the court's statement that Diaz and Naranjo together concocted a plan to kill her family members and that her conduct after the killing belied her version of the story demonstrate that the court did not find Diaz's theories that she was gullible or unduly influenced by Naranjo credible. Such

20

credibility findings are solely for the trier of fact (here, the trial court) to make.  (*People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Oliver*, *supra*, 90 Cal.App.5th at p. 480.)

We reject Diaz's claim that her resentencing counsel rendered ineffective assistance of counsel.  To prevail on her claim of ineffective assistance, Diaz must show (1) the failure to raise an argument fell below an objective standard of reasonableness under prevailing professional norms, and (2) such failure prejudiced her, meaning there is a reasonable probability that, had counsel raised the argument, the court would have ruled differently on her petition.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2042, 80 L.Ed.2d 674]; *People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)  Defense counsel did not fail to argue Diaz's age; he in fact highlighted that Diaz was 16 years old at the time of the murders in arguing the court should grant relief under section 1172.6.  Diaz's contention that defense counsel could have made a better argument than he did "is not a sufficient basis for finding deficient performance by defense counsel."  (*People v. Ledesma*, *supra*, at p. 748.)

Because the trial court's finding that Diaz was a direct aider and abettor with the intent to kill is a sufficient basis to have denied her section 1172.6 petition, we need not also consider Diaz's argument that the trial court erred in not considering her youth in determining whether she acted with reckless indifference to human life.

## DISPOSITION

The order denying Diaz's section 1172.6 petition is affirmed.

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

Filed 2/11/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B339253 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA060767) |
| v. | |
| MONICA DIAZ, | ORDER CERTIFYING FOR PUBLICATION |
| Defendant and Appellant. | |

The opinion in the above-entitled matter filed on January 28, 2026, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

WEINGART, J.        ROTHSCHILD, P. J.        BENDIX, J.